UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------------------------------------------------- X

SHERYL WULTZ, *et al.*,

                 Plaintiffs,

         *-against-*

BOC LIMITED,

                 Defendant,

         *-against-*

RIVKA MARTHA MORIAH, *et al.*,

                 Intervenors,

         *-against-*

THE STATE OF ISRAEL,

                 Movant.

------------------------------------------------------------------- X

Miscellaneous Docket No.:
13-1282 (RBW)

Civil case number 11-1266 (SAS) pending in the United States District Court for the Southern District of New York

**EXPERT DECLARATION OF ROY COHAVI
AS TO THE APPLICABLE LAW OF THE STATE OF ISRAEL**

      **ROY COHAVI**, pursuant to 28 U.S.C. § 1746, declares the following statements to be true, subject to the penalties for perjury of the United States of America:

      1.       I am an attorney licensed to practice law in the State of Israel. I have been asked to prepare this declaration to explain Israeli law as it applies to the enforceability of the State of Israel's undertaking to assist the plaintiffs and their attorneys in the claims against the Bank of China ("BOC"), generally; and in providing the evidence required by the plaintiffs, specifically; and in placing the witness Uzi Shaya at the disposal of the plaintiff, especially.

## A.     Relevant Factual Background (as provided by plaintiffs' attorneys)

2.     Since 2000 Israeli attorney Nitsana Darshan Leitner has represented victims of terror and their families in suits against terrorist entities (terrorist organizations, terror-supporting states) and against financial institutions involved in the funding of terror, and has acquired a significant reputation in this area, both in and outside of Israel. Ms. Darshan-Leitner's office primarily engages in litigation of civil actions and enforcement of judicial decisions on behalf of terrorist victims and their families, in Israel, in the U.S.A. and in other places around the world.

3.     In the course of the wave of Palestinian terrorism that began on 29 September 2000, also known as "al-Aqsa Intifada" or "Second Intifada," a connection was established between Darshan-Leitner's office and representatives of the State of Israel who work for the "Harpoon Unit," at the initiative of the State's representatives.

4.     According to historian and author Dr. Ronen Bergman, the Harpoon (in Hebrew, "*Tziltzal*") is a unit that was established by General (Res.) Meir Dagan, who served in the position of the Head of The Institute for Intelligence and Special Operations (known by its abbreviated title "the Mossad"), between the years 2002-2011.[1]

5.     The Mossad is a foreign intelligence organization of the State of Israel. The Mossad is an agency subordinate to the Prime Minister's Office. The Head of the Mossad is subordinate to the Israeli Prime Minister, operates in accordance with his instructions and is responsible to the Prime Minister (who is the head of the Executive Branch of Israel).

---

[1] Ronen Bergman, The Secret War with Iran: The 30-Year Clandestine Struggle Against the World Most Dangerous Power http://books.google.co.il/books?id=NkxZcHL1xdYC&pg=PA&dq=ronen+bergman+harpoon&hl=en&sa=X&ei=0vauUv_mHamr4ASFtIDQAw&ved=0CC0Q6AEwAA#v=onepage&q=ronen%20bergman%20harpoon&f=false

6.      The Harpoon unit's objective is to serve as the headquarters of the Prime Minister and the government for organizing and coordinating the battle against funding of terrorism. The Harpoon unit functions within the framework of the Counter-Terrorism Bureau.

7.      The Counter-Terrorism Bureau was founded in March of 1996 in accordance with Government Resolution B/20. Its goal is to serve as the headquarters for the Prime Minister, and the Government for counter-terrorism, and is intended to serve as a coordinating and organizational body between all the bodies working in counter-terrorism for the purpose of improvement of the national response to the various terror threats.  One of the fields of activity of the Counter-Terrorism Bureau is the coordination between international organizations in the battle against the funding of terrorist organizations.  The Counter-Terrorism Bureau is a branch of the National Security Headquarters (formerly the "National Security Council").

8.      The National Security Headquarters is the Headquarters of the Prime Minister and the Government for matters foreign affairs and security of the State of Israel. It was established under the name of the National Security Council in accordance with Government Decision 4889 of March 7, 1999, and it currently operates by force of National Security Headquarters Law, 5768-2008. During all the years of its operation, initially under the name of the National Security Council and subsequently under its current name, the headquarters has operated in the Prime Minister's Office, operating under the instructions and guidance of the Prime Minister. The Head of National Security is directly responsible to the Prime Minister.

9.      In the framework of the connections established between Ms. Darshan-Leitner and the personnel of the Harpoon unit, the parties met frequently over the years, and in the course of their meetings Ms. Darshan-Leitner updated the Harpoon unit regarding her activities

and received numerous details from the Harpoon personnel that were of assistance in the various legal proceedings against terrorist entities and those involved in funding terror.

10.    Many of the legal proceedings instituted by Ms. Darshan-Leitner and her colleagues against the terrorist entities, and against those involved in funding terror, and against assets belonging to terrorist entities are the result of items of information provided to Ms. Darshan-Leitner by Harpoon agents, and were even the result of explicit requests made by Harpoon personnel from Ms. Darshan-Leitner to adopt legal proceedings against entities involved in funding of terror. There were numerous cases in which the Harpoon personnel informed Ms. Darshan-Leitner that the legal proceedings against entities involved in funding terror were making a significant and quantifiable contribution towards halting the funding of terror by the financial institutions that were sued, in the deterrence of other financial institutions from financing terror and in the internalization of the message pertaining to the importance of an active battle against the funding of terror by way of financial institutions all over the world. *Inter alia*, Harpoon personnel related that in the wake of legal proceedings instituted by Ms. Darshan-Leitner and her colleagues against financial institutions involved in funding terror, by act or omission, numerous financial institutions had began to make enquiries with the Harpoon people by way of the Prime Minister's Office requesting their comments and guidance before the execution of exceptional banking activities or actions involving elements the legitimacy of which were suspect (Pre-Ruling).

11.    In 2007 Harpoon personnel informed Ms. Darshan-Leitner that accounts were being conducted in BOC belonging to a person known as Shurafa, who was connected to Hamas and the Palestinian Islamic Jihad organizations (both of these organizations are defined as terrorist organizations by both Israel and the United States). Shurafa, as noted by Harpoon

personnel, received funds in his accounts in BOC from the Hamas and Palestinian Islamic Jihad headquarters in Syria from where they were transferred to his brother in Gaza Strip, and from the brother would transfer the funds to the Hamas and Palestinian Islamic Jihad. Harpoon personnel informed Ms. Darshan-Leitner that they had met with senior personnel of the Central BOC and of the Chinese Finance Ministry, and had informed the Chinese officials of the funds transfers, and requested that they close Shurafa's accounts in BOC. After the Chinese interlocutors had examined the matter with BOC they responded to the Harpoon personnel that they had investigated the matter with the Bank and that the Bank's conduct did not involve the violation of any Chinese Law.

12.     Harpoon personnel asked Ms. Darshan-Leitner whether she would be able to utilize the aforementioned information to sue BOC in the U.S.A and in doing so (in addition to obtaining monetary compensation for the plaintiffs) to cause BOC to change its conduct (namely to close the aforementioned accounts and not to allow any further transferring of funds via BOC) and thus contribute to the deterrence of other financial institutions from funding terror and promoting the inculcation of the norms of an active struggle against the funding of terror by way of financial institutions.

13.     Ms. Darshan-Leitner responded that they would be pleased to file and conduct a suit against BOC, subject to the condition that Harpoon people would provide them with all of the evidence required for the successful handling of claims of this kind. Ms. Darshan-Leitner made it clear that this evidence included the relevant account numbers and particulars pertaining to the bank transfers conducted via BOC, at the maximal level of specificity possible, as well as testimony of Harpoon personnel substantiating the facts that gave rise to the imposition of responsibility in tort upon BOC.

14.     Ms. Darshan-Leitner clarified to the Harpoon personnel that at the first stage, in order to successfully respond to the initial motion to dismiss the suits which would most certainly be filed by BOC, it would be useful to have an affidavit from Harpoon personnel, but that later on they would require all of the evidence, as mentioned above.

15.     Ms. Darshan-Leitner made clear to the Harpoon personnel that the legal proceedings against BOC were likely to involve considerable financial costs, and extensive investment of effort in overcoming the complex problems which were expected to emerge in the course thereof, both in the handling of the suit over an extended period of time (many long years) in a number of judicial forums. Ms. Darshan-Leitner further stated to the Harpoon personnel that she had no intention of entering into a costly, complex and protracted legal proceeding against the BOC and that moreover, they had no intention of creating expectations for the successful prosecution of the claim, both on their own part and among dozens of plaintiffs, if ultimately they were to compelled to withdraw the claims, or to lose them, by reason of the lack of evidence required to prove them. Ms. Darshan-Leitner made it quite clear to the Harpoon personnel that in the event of her being forced to withdraw the claims, or event in the event of losing the suits due to lack of evidence, it was likely that they would be exposed to claims of the various plaintiffs against them, and to significant and irreversible damage to their reputation that they had painstakingly created in the course of long years of hard work. Ms. Darshan-Leitner made it quite clear to the Harpoon people that providing her with the evidence that the suits required, placing it at her disposal and for her use, was a critical and indispensable condition for filing the suits against BOC by way of their agency, and that this requirement was not only a condition of Ms. Darshan-Leitner and her colleagues but was also a condition of the plaintiffs and for the benefit of the plaintiffs, whoever they might be, especially in view of the fact that plaintiffs of

this kind are victims of terror and their families, and as such are people who have already undergone significant suffering, and that there was no justification for pointlessly aggravating their wounds and fostering vain hopes which could not be realized.

16.     In the wake of the response of Ms. Darshan-Leitner and her colleagues (and via their agency, the response of the potential plaintiffs), these requirements being for their benefit too) and in view of all of the aforementioned clarifications, the Harpoon people promised to vet the matter with their superiors and to give a substantive response following an extensive examination of all aspects of the matter by the relevant bodies.

17.     Many months later, the Harpoon personnel came back to Ms. Darshan-Leitner and informed her that following consideration and examination of the matter by the competent authorities in the Prime Minister's office, it had been decided to comply with the conditions specified above, and that at the first stage they would provide particulars concerning the relevant bank accounts, and some of the bank transactions and would enable the testimony of the Mossad agent regarding the alleged facts.

18.     In reliance on this undertaking, and exclusively by reason of this undertaking, Ms. Darshan-Leitner consented to work towards the filing of the suits against BOC in the U.S.A., and the suits were filed in the names of dozens of terrorist victims and families of terrorist victims and/or their relatives who had been injured in attacks of the Hamas, and the Palestinian Islamic Jihad organizations.

19.     As anticipated, BOC filed a motion to dismiss. The reasons given for the application included the lack of evidence.

20.     In May 2009, as part of their compliance with the aforementioned undertaking, Harpoon personnel provided Ms. Darshan-Leitner and her colleagues with an affidavit of a

former member of the security network, Mr. Shlomo Matalon. In the framework of the affidavit, Matalon verified the facts that had been included in the plaintiffs' response to BOC's motion to dismiss. This affidavit helped Ms. Darshan-Leitner and her colleagues obtain a decision denying the motion to dismiss.

21.      In order to refute motion to dismiss, Ms. Darshan-Leitner and her colleagues invested extensive amounts of time money and work, *inter alia* obtaining expert opinions that involved considerable financial expense.

22.      After Ms. Darshan-Leitner and her colleagues had succeeded in defeating the motion to dismiss, they sought to have the intelligence agent, Uzi Shaya, testify regarding the facts set forth in the affidavit of Shlomo Matalon—as had been promised.

23.      Uzi Shaya agreed to testify and requested the approval of the State of Israel. The State of Israel gave its consent to the testimony and conducted negotiations with Ms. Darshan-Leitner regarding the technical conditions subject to which his testimony would be given.

24.      The negotiations were completed regarding the testimony, in the wake of which Uzi Shaya sent a letter to the court that was hearing the suit specifying the conditions of his testimony. These were the technical conditions for giving testimony, given that the issue of giving this specific testimony per se had already been agreed upon, even before the agreement on these conditions (as stipulated in the previous section); furthermore, the giving of testimony was also part of the initial undertaking of the State of Israel, via the Harpoon Unit, to provide Ms. Darshan-Leitner and her colleagues with the evidence required to prove the claims.

25.      A month or so after sending of the aforementioned letter of Uzi Shaya, the State of Israel prohibited him from testifying in the proceedings against the BOC.  The State of Israel now claims that this prohibition is based on considerations of State security; however, as stated,

all of the information regarding which Uzi Shaya was supposed to testify was already set forth in the affidavit of Shlomo Matalon, which was already submitted in these suits in the year 2009. This affidavit is public and its contents are open to all those interested.

26.     As a result of the said prohibition, Darshan-Leitner, her colleagues and the plaintiffs represented by Darshan-Leitner and her colleagues are liable to incur grave damage, the thrust of which is a grave difficulty in proving their claims in full, and to merit the remedy in its entirety, with that is implied thereby (as stated above).

27.     Darshan-Leitner and her colleagues surmise that the testimony of Shaya will be of tremendous and even decisive value in proving their suits and in receiving the remedy in its entirety. This, is in view of the contents of the testimony that was requested and approved, the involvement of Uzi Shaya in this case vis-a-vis the Chinese parties, in view of his personal knowledge of the case, and in view of the fact that his work in this case was done in his capacity as an employee of the State of Israel, and as part of a mission for the State of Israel, and in view of Shaya's extensive personal reliability (of which Darshan-Leitner and her colleagues are aware based on their joint activities).

28.     Had Darshan-Leitner and her colleagues surmised or suspected that there was even the slightest chance of the State of Israel reneging on its undertaking and the claims that were filed as a result of its own initiative, it would never have occurred to them to file the claims against the BOC, they would not have consented to represent the plaintiffs against the BOC and they would have made firm recommendations to the plaintiffs not to sue the BOC, not even by way of other attorneys. Had the plaintiffs harbored estimations or suspicions of this nature, it would never have occurred to them to join in the claims against the BOC, to aggravate their wounds and to then experience the disappointment of having joined in these claims.

**B.      The Legal Questions in this Case**

29.      The legal questions necessary for purposes of this legal opinion are as follows:

a)      Is the undertaking of the State of Israel, to provide Ms. Darshan-Leitner and the plaintiffs with the evidence necessary for them to conduct their suits against BOC, legally binding under Israeli Law?

b)      By force of this undertaking, is it possible under Israeli Law to force the State of Israel to enable the testimony of Uzi Shaya?

c)      Does the specific undertaking to enable the testimony of Uzi Shaya, subject to the conditions set forth Shaya's letter to the court, have binding legal force under Israeli law?

d)      Under Israeli Law, can this specific undertaking of the State of Israel be enforced upon the State of Israel; namely can the State of Israel be compelled to enable the testimony of Uzi Shaya under the conditions that were agreed upon and specified in Shaya's letter of March 20, 2013?

**C.      The Normative Framework**

30.      The normative framework for discussion of the legal questions specified above is primarily that of Israeli administrative law, and partially of Israeli contracts law.

31.      Israeli administrative law is anchored partially in legislation (primary and secondary legislation, proclamations, etc. and other regulations of statutory effect); and partially in the internal directives of the various administrative authorities. A significant part of it is the product of case-law, in other words Common Law, the intention being primarily to rulings of the Israeli Supreme Court sitting as the High Court of Justice by force of section 15 (c) and 15 (d) of Basic Law: the Judiciary, which is the legislation that establishes and regulates the foundations

of the Israeli legal system, and which has been interpreted by the Supreme Court as enjoying constitutional status. Since the enactment of the Administrative Courts Law, which empowered the Israeli district courts to hear administrative matters, in their capacity as administrative courts, some of the development of Israeli administrative law has been the work of these administrative courts (albeit lacking the standing of rulings of the Supreme Court, which have the force of binding precedent upon all other instances of the Israeli legal system, apart from upon the Supreme Court itself). Decisions of the administrative courts are of guiding standing only with respect to forums on a lower level. Naturally, decisions of the administrative courts are binding upon the parties themselves.

32.     The legal questions posed above can be analyzed from the perspective of each of the following doctrines of Israeli administrative law. The Doctrine of Governmental/Administrative Promise; the Doctrine of Administrative Estoppel (Estoppel against an Authority); the Doctrine of a Governmental/Administrative Contract. Given that the requisite conditions for the application of each of the doctrines differ, there is nothing in principle to prevent a promise, undertaking, representation, or governmental/administrative contract being simultaneously governed by more than one of the aforementioned doctrines, and there may also be situations in which all three doctrines are applicable to one and the same set of facts-circumstances (in other words, a particular set of circumstances may give rise to a binding governmental promise, estoppel against a governmental authority and a governmental contract).

33.     The aforementioned legal questions should be examined in the framework of each of the relevant doctrines, against the background of the intensified duty of fairness and good faith by which the governmental authority is bound HCJ 840/79 *Contractors and Builders Center in Israel v. Government of Israel* 34 (3) P.D. 729; HCJ 389/80 *Golden Pages Ltd v. Broadcasting*

*Authority* 35(1) P.D. 421; HCJ 376/81 *Moshe Lugassi v. Communications Minister* 36(2) 449;

HCJ 665/83 *Israeli, Yerushalmi Cohen, and Co v. Yaakov Or* 38(2) 348; HCJ 4267/93 *Amittai –*

*Citizens for Proper Administration and Honesty v. Yitzchak Rabin, Prime Minister of Israel*

(published in Nevo Internet database site, operated by the official publisher of the decisions of

the Supreme Court); CA 6518/98 *Hod Avid Ltd. v. Israel Lands Administration,* 55 (4) P.D 28).

## C.1     The Doctrine of a Governmental Promise

34.     As held in a series of decisions handed down by the Supreme Court as of the

1970's (the first of them being the decision in HCJ 135/75 *Sai-Tax Corporation Ltd v. Minister*

*of Trade and Industry* 30(1) P.D. 673), in Israeli administrative law, a promise or an undertaking

of the governmental/administrative authority (usually referred to as a "governmental promise" or

"governmental undertaking" is legally binding assuming the fulfillment of certain conditions;

this will be case even where it does not constitute a contract under Israeli Law (see below) and

even if it does not give rise to estoppel in Israeli Law.

35.     A governmental promise is legally binding and enforceable in an Israeli court it

satisfies all of the following four conditions, and subject to the additional condition that none of

the following exceptions are applicable. These are the four conditions:

a)     The promise is clear and explicit;

b)     The promise was made with authority, in other words by a source that was

permitted to give it within the framework of a matter in relation to which he was authorized to

make decisions;

c)     The governmental authority intended to give a legally binding promise (as distinct

from a purely gentlemanly promise) and the entity accepting the promise accepted it as a legally

binding promise.

d)      The promise is executable.

HCJ 4915/00 *Communications and Productions Network (1992) Ltd v. Government of Israel* 54(5) 451; CA 2553/91 *Vegetable Growers Organization – Cooperative Agricultural Association Ltd. v. State of Israel* 58(5) 481.

36.      The exception to the legally binding validity of a promise that satisfies all of the four aforementioned conditions is that there is a legal justification for changing or altering it. A legal justification exists where there is a compelling public interest that should trump the duty in principle of upholding the promise CA 2064/02 *Tishlovet H. Aloni Ltd v. Nesher Municipality* 59(1) P.D. 111.

37.      A party claiming the existence of a governmental promise and seeking its enforcement carries the burden of persuading the court of the fulfillment of the four cumulative conditions mentioned above; once the party making the claim has discharged the burden of persuasion the governmental authority bears the burden of persuading the court of the existence of the exception to the legally binding effect of the governmental promise.

38.      The case law of the Supreme Court and the Israeli Military courts over recent years has given renewed and reinforced validity to the above, and to the readiness of the court to actually enforce the fulfillment of the governmental promise, assuming the fulfillment of the four aforementioned conditions and where the existence of an exception to enforcement was not proved.

a)      CrApp 5129/09 *Israel Lands Administration v. Moshe Rashkash et al* (published in Nevo Internet database site, operated by the official publisher of the decisions of the Supreme Court)

-13-

b)      AAA 7275/10 *Special Committee under Implementation of the Disengagement Plan Law v. Amiram Shaked and 18 others* (published in Nevo Internet database site, operated by the official publisher of the decisions of the Supreme Court)

c)      LCA 8226/11 *Shaul Bata v. State of Israel – Israel Lands Administration, Central District* (published in Nevo Internet database site, operated by the official publisher of the decisions of the Supreme Court)

d)      McApp 2631/11 *The Military Prosecution v. Jamal Abed El-Hamid Mohammed Hajj* (Published in Nevo Internet database site, operated by the official publisher of the decisions of the Military Courts)

## C.2     The Estoppel Doctrine (Estoppel against the Authority)

39.      Under the estoppel doctrine in Israel, where a person makes a certain representation to another, or makes him a particular promise, he will be prevented from denying the factual veracity of the representation or the legal validity of the promise in any judicial proceeding if the person before whom the presentation was made or to whom the promise was given relied on the representation or the promise in a reasonable manner and in good faith, and changed his situation to his detriment as a result of that reliance (CA 19/81 *Binyamin Bibi v. Dr. Karl Horbert* 37(2) P.D. 497).

40.      For purposes of the estoppel doctrine, no significance attaches to the manner in which the promise was made. The representation may be made explicitly (orally or in writing) and generally (by way of conduct)

41.      For purposes of applying the estoppel doctrine, it is immaterial if the factual representation was correct as such; the doctrine can be applied even when it transpires that the

representation was not true as such, provided that the conditions for recognizing the existence of estoppel were satisfied, as stipulated above.

42.      For purposes of applying the estoppel doctrine it is immaterial if the promise which gave rise to the estoppel has legal validity as such, in the form of a governmental promise or a contract. The doctrine can be applied even if it transpires that the promise forming the subject of estoppel claim was not legally binding as such provided that the conditions for recognizing the existence of estoppel were satisfied, as stipulated above.

43.      The reliance on the promise must be reasonable (in an objective sense) and in good faith; this means that in the event that the person to whom the representation was made, or the person to whom the promise was given relied on the representation or the promise notwithstanding that the representation or the promise were of a kind that a reasonable person would not have relied upon under the circumstances; the reliance will be regarded as unreasonable and the estoppel claim will not be allowed. In addition, the meaning of the requirement of good faith is that in places in which the reliance is tainted by a lack of good faith, it will be regarded as inadequate and the estoppel claim will not be allowed.

44.      For example, in relation to the requirement concerning the reasonability of the reliance: A person comes to the offices of a government body responsible for the issuing of a particular category of license, for the promotion of licenses belonging to that particular category and a clerk in those offices makes a representation or gives him a promise to the effect that if he complies with certain conditions or performs particular acts he will be entitled to the desired license; his reliance on this kind of representation would be considered reasonable. On the other hand, where a person came to the same offices and the same representation was made to him, or the same promise was given to him by a vendor in the cafeteria of the governmental body, his

reliance on that representation or promise would be regarded as non-reliable because it is unreasonable to expect that a reasonable person, under those circumstances, would rely on a representation made or a promise given by an entity in that category.

45.      An example of good faith in reliance: The person from the previous example, who reasonably relied on the clerk's promise, will be regarded has having relied in good faith if there was no reason to suspect that the representation was incorrect, or that the clerk was not authorized to make the promise; however, if the same person harbored suspicions regarding the nature of the representation or the promise, and refrained from clarifying the suspicion and continued to rely on the representation or the promise, or if after some time he became aware that the representation or the promise, were given without authority, and despite this fact he continued to rely on the representation or promise, he will not be able to be regarded as someone who relied on a representation or promise in good faith, even if that reliance would have been regarded as reasonable and in good faith in had it not been for that suspicion or knowledge.

46.      A detrimental change must be an actual change for the worse, and such as was caused by the reliance on the representation or promise.

47.      The case law of the Supreme Court in relation to the existence of estoppel in relations between a private individual and a governmental authority, in the conditions set forth above, is not consistent and ranges between an expansive approach (which finds expression in the decision in CA 6996/97 *Abada Ltd v. The Development Authority represented by the Israel Lands Administration* 53(4) P.D. 117 and a restrictive approach (which finds expression in the decision in CA 670504 *Beth Harechev Ltd v. Municipality of Jerusalem*).

48.      In accordance with the expansive approach, when the conditions of estoppel are satisfied in the framework of the relations between the private individual and the governmental

authority, the estoppel can be enforced. According to this approach, in the event that the enforcement is not possible (including by reason of a compelling public interest) it is possible to execute alternative enforcement (*cy pres*), and in the event that even alternative enforcement is not possible, it is possible to award anticipatory compensation, in other words, a compensation that will place the individual in a position equivalent in value to what his position would have been had the estoppel been enforced

49.     According to the most extreme version of the restrictive approach, Israeli law recognizes the estoppel claim, but it must be used with great caution. All the same, while it cannot be determined that the expansive approach is binding law, it is quite certain that the restrictive version in its most extreme form is not binding law. Moreover, even in the most outstanding example of a case which adopted the restrictive approach (in the aforementioned matter of *Beth Harechev,*) the court refused to impose the full price of the mistake of the governmental authority on the private individual-victim, and ruled that the price would be borne by the governmental authority and the private individual in equal parts. This ruling represents a *de-facto* recognition of the existence of estoppel, even if the court did not give it formal recognition in this case.

50.     The case -law as whole indicates that the dilemma with respect to the operation of estoppel against an authority relates to situations in which the representation or promise forming the basis of the estoppel contravene the rules of Israeli administrative law (for example, when the representation was made or the promise given by someone who was not authorized to deal in the relevant issue, or to decide on it) or where the representation or the promise contravenes a statutory provision.

51.     In the absence of a clear and explicit rule on the matter, the most reasonable conclusion regarding the existing legal position is that in cases in which all of the conditions required for recognition of the estoppel claim are satisfied, and the representation or the promise are not contrary to the rules of Israeli administrative law, or a statutory provision, estoppel will operate against the authority, and such an estoppel will be enforceable.

52.     In the absence of a clear and explicit rule on the matter; against the background of the previous sections concerning the trends in the Israeli Supreme Court in relation to this subject; against the background of the intensified duty of good faith of the governmental authority, and against the background of the courts' tendency to have special consideration for the gravity of the harm to the individual, caused by the conduct of the governmental authority, and to ascribe weight to the gravity of the harm caused (as indicated even in the decision representing the restrictive approach in its most extreme form), the most reasonable conclusion regarding the existing legal position is as follows:

a)     In a case which satisfies all of the conditions required for recognition of the estoppel claim, and in which the representation or the promise are not in conflict with the rules of Israeli administrative law, or the statutory provision, and in which the governmental authority acted in a manner that is not commensurate with the intensified duty of good faith by which it is bound, the estoppel against the authority is applicable and the tendency to enforce the estoppel (and if enforcement is not possible, the tendency to enforce alternative enforcements) will be intensified relative to a situation in which the authority acted in good faith, even if the individual did not incur any major harm as a result of his reliance on the representation or the promise.

b)     In a case which satisfies all of the conditions required for recognition of the estoppel claim, and in which the representation or the promise are not in conflict with the rules of

Israeli administrative law, or the statutory provision, and in which the individual incurred significant harm as a result of reliance on the representation or the promise, the estoppel against the authority is applicable and the tendency to enforce the estoppel (or to resort to alternative enforcements if the enforcement is not possible) will be intensified relative to a situation in which the individual did not incur any major harm, even when the governmental authority acted in good faith..

c)      In a case which satisfies all of the conditions required for recognition of the estoppel claim, and in which the representation or the promise are not in conflict with the rules of Israeli administrative law, or the statutory provision, and in which the governmental authority acted in a manner that is not commensurate with the intensified duty of good faith by which it is bound in addition to which the individual incurred significant harm as a result of his reliance on the representation or promise, the tendency to enforce the estoppel (or to determine an alternative enforcement of enforcement is not possible) will be even greater, in comparison to the two previous cases.

## C.3      The Governmental Contract Doctrine

53.      The existing law in Israel regarding the governmental contract is as follows:

a)      A governmental contract, like any other contract, is concluded upon the fulfillment of the conditions prescribed in the Contracts (General Part) Law, 5733-1973, for the conclusion of a contract by way of offer and acceptance (which means the offeree's confirmation that he wishes to enter into a contract in accordance with the offer), and where an offer made by one person to another will be regarded as an offer if it attests to his clear intention (resolve) to enter into a contract with the offeree, and is sufficiently definite to make it possible for the contract to be concluded by its confirmation on the part of the offeree.; the offerees's

confirmation of the offer is by way of a notice given to the offeror that attests to his resolve to enter into a contract with the offeror in accordance with the offer. An offer of the addressee that contains an addition, restriction or any other change in comparison to the original wording will be regarded as a new offer (when the offeror is the addressee of the original offer).

Acceptance can be by way of conduct, including an act done in implementation of the contract, if these ways are implied by the offer. For example: When a person comes to a shop and requests to purchase something, the very act of placing the item on the shelf of the shop constitutes an offer of the shop owner to the customer to purchase the product at the price appearing thereon, and the customer accepts the offer by taking the product and paying for it.

b)      The Contracts (General Part) Law, 5733-1973 establishes the duty of negotiating a contract in a customary manner and in good faith (section 12 of the Law) and establishes the obligation to act in a customary manner and in good faith in the performance of an obligation arising from a contract, and in the exercise of a right arising from a contract (section 39 of the contract). Similarly, section 61 (b) of the law applies the provisions of the law, to the extent appropriate and mutatis mutandis, to all legal acts other than contracts and to obligations that do not arise out of a contract. The good faith principle is a meta-principle in Israeli law in general, and specifically, in Israeli administrative law.

c)      Israeli law recognizes the principle of a contract for the benefit of a third party. The government contract, like any other contract, can be for benefit of a third party. According to the provisions of Contracts (General Part) Law, 5733-1973, when a person gives a contractual undertaking concerning someone who is not a party to the contract, the third party can demand fulfillment of the obligation, if the intention to confer that right on him is apparent from the contract. The right of a third party may be changed or cancelled for as long as neither of the

parties to the contract have notified the third party of his right under the contract (in other words, from the moment that the third party accepted the notice of his right under the contract, it is no longer possible to cancel the undertaking in his favor other than in accordance with one of the legally recognized grounds for rescinding a contract. The third party's right to demand performance of the undertaking towards him does not detract from the right of a party to the contract to demand fulfillment of the undertaking to the third party, and naturally does not detract from the right of a party to the contract to demand fulfillment of the contractual undertakings towards him.

d)      A contract is void or voidable under certain circumstances: When a contract is concluded purely for the sake of appearances; when a party to the contract entered into a contract in consequence of a mistake (assuming the occurrence of particular circumstances and subject to certain exceptions, and not in every case of mistake); when a party to the contract entered into a contract in consequence of a mistake that is the result of deceit practiced on him by the other party or by a person who acts on his behalf; where a party to a contract entered into a contract in consequence of duress applied to him by the other party or by a person acting on his behalf; where a party to the contract entered into a contract in consequence of extortion exercised by the other party, or a person acting on his behalf (assuming the occurrence of particular circumstances). If a contract can be divided and the grounds for rescission relate to only one of its parts, that part alone will be subject to rescission. However, if the party entitled to rescind would not have entered into the contract but for that ground, he may rescind the whole contract. Rescission of a contract will be by notice by the rescinding party to the other party, given within a reasonable time after he became aware of the grounds for rescission (apart from in the case of

duress, when the rescission must be done within a reasonable time after he became aware that the duress has ceased).

e)      The principle remedy (in addition to other remedies) for cases of a breach of contract is the remedy of enforcement. Section 3 of the Contracts (Remedy for Breach of Contract), 5731-1971, prescribes that the party entitled to performance of the contract, is generally entitled to remedy of enforcement of the contract, unless the contract is not executable, or constitutes coercion to do or to receive personal labor or service, or where the enforcement order requires an unreasonable degree of supervision on the part of the court or the execution office, or where the enforcement of the contract would be unreasonable having consideration for the circumstances of the case.

f)      In the Mandatory Tenders Law, 5752-1992, section 2(a) provides inter alia that the contractual engagement of the state and its bodies and its other governmental authorities) for the execution of a transaction in goods or in land, or for the execution of work, or for the purchase of services, may only be concluded pursuant to a public tender that allows every person an equal opportunity to participate in it. This obligation is subject to numerous exceptions, including various categories of absolute exemptions therefrom, and cases in which the tender will be a closed one, or which will allow negotiations between the tenderees and others. Not all contractual engagements of the state are subject to the obligation of conducting tenders, but only an engagement the subject of which is a transaction belonging to one of the categories specified above.

g)      In addition to the grounds for rescission of a contact recognized by Israeli law in general, the administrative law also created the "release rule" that enables the government authority to be released from its contractual undertaking (where the preliminary assumption in

the application of this rule is that a contract was actually concluded), assuming the existence of compelling justification grounded in public interest, when a contract concerns foreign affairs or security, there is a need for a relevant change in circumstances to justify the release of the governmental authority therefrom. There is a dispute in case law regarding the question of whether a change in policy or a mistake can justify the releasing of a governmental authority. In fact, resort to the "release rule" has been moderate and the governmental authorities in Israel have not made extensive use of the release claim, primarily due to their concern that excessive use of the release claim will give rise to reluctance to enter into contractual engagements with them, or to a higher pricing of contractual engagements by parties contracting with them.

### d.      From the General to the Particular

### D.1     The Conclusions

54.     In view of the relevant factual background and in view of the normative framework as set out above, the application of the normative framework to the particular circumstances leads to the following conclusions:

a)      The undertaking given by the State of Israel to provide Darshan-Leitner and the Plaintiffs with the evidence required by them for purposes of conducting the claims against BOC and the specific undertaking to enable the testimony of Uzi Shaya (both as part of the broader undertaking and independently) are of legally binding effect in Israeli Law; this is the case both in terms of a governmental promise, by force estoppel against an authority, and as a governmental contract between Darshan-Leitner and the plaintiffs on the one hand, and the State of Israel, on the other hand.

b)      The aforementioned undertakings are legally binding not only on the level of the relations between the State of Israel and Darshan-Leitner, but also on the level of the relations

between the State of Israel and the plaintiffs who are represented by Darshan-Leitner in terms of a governmental promise, by force of estoppel against an authority, and by force of a governmental contract between the State of Israel and the plaintiffs (by way of their attorneys), and alternatively as a contract in favor of a third party, inasmuch as the plaintiffs are a third party (irrespective of whether one relates to the specific undertaking as one which stems from a broader undertaking, or if one relates to the specific undertaking as an independent undertaking, standing it its own right).

c)      By force of these undertakings (in other words, the broader undertaking and the more specific one deriving therefrom), it is possible to force the State of Israel, under Israeli Law, to enable the testimony of Uzi Shaya in accordance with the conditions agreed upon and stipulated in Shaya's letter of March 20, 2013 (both if one relates to the specific undertaking as stemming from the broader undertaking, and if one relates to the specific undertaking as an independent undertaking in its own right).

### D.2     The Undertaking of the State of Israel by way of Harpoon—Binding Governmental Promise

55.      Both the broader undertaking and the specific undertaking regarding the testimony of Uzi Shaya (both if one relates to the specific undertaking as stemming from the broader undertaking, and if one relates to the specific undertaking as an independent undertaking in its own right), constitute a legally binding governmental promise

56.      The aforementioned undertakings were explicit, clear and, beyond what is required - they were detailed. The undertakings were given after protracted consideration. They are anchored in the exchanges between Darshan-Leitner (and via her, the potential plaintiffs who subsequently became the plaintiffs in fact), the Harpoon personnel in general, and with Uzi Shaya personally; in the conduct of the Harpoon unit, including the initiating of claims against

BOC by the Harpoon unit, giving the affidavit of Shlomo Matalon, and the conduct of negotiations (technical) concerning the conditions under which the Uzi Shaya' testimony would be given; and in the reliance of Darshan-Leitner, and the plaintiffs on the undertakings (notwithstanding that the element of reliance as such is not essential for proving the existence of a governmental promise of binding legal effect, in view of the intensified duty of good faith that binds the governmental authority, this reliance also supports the enforcement of the governmental promise).

57.     The aforementioned undertakings were given with authority by the Harpoon unit which is a body of the Israeli Government, subordinate to the Prime Minister's Office (as part of the Counter-Terrorism Bureau, which is part of the National Security Headquarters), charged with conducting the battle against the financing of terror on behalf of the Israeli Government; following extensive consideration, and also having negotiated with Darshan-Leitner (and in fact, also with the potential plaintiffs, and subsequently with the plaintiffs by way of Darshan-Leitner. As stated, special significance should be ascribed to the fact that the proceedings against BOC were actually initiated by the State of Israel by way of Harpoon, as part of its activity in the battle against the financing of terror, and in order to promote that activity.

58.     The aforementioned undertakings were given by the State of Israel, by way of the Harpoon unit, as a legally binding undertaking, and were accepted as such by Darshan-Leitner, and the plaintiffs (both when they joined the claims and when the specific undertaking was given by the State concerning the testimony of Uzi Shaya; both in favor of the plaintiffs directly, and in favor of the plaintiffs as a third party). It was made clear to Harpoon that in the absence of a clear undertaking, the claims against BOC would not be filed, and they also received a clarification regarding the reasons for this and concerning the damages liable to be caused to

Darshan-Leitner, and the plaintiffs in the event of the suits being filed, without the evidence required for them being placed subsequently placed at their disposal. It was only after this undertaking was given, and after Darshan-Leitner and the potential plaintiffs (and subsequently the plaintiffs in fact) were satisfied that the undertakings to them would be honored, that the suits were filed. Moreover, the actual execution of the undertaking (until the sudden refusal to allow Uzi Shaya to testify despite the broader undertaking and the specific undertaking given on this matter), likewise indicate that the State of Israel too regarded them as binding, meaning that State of Israel's repudiation of its undertaking is the exception to its conduct during the entire period and directly contrary to its previous conduct (including the letter of Uzi Shaya to the court).

59.     These undertakings are executable: The relevant information, technically, is currently in the hands of the State of Israel, the Harpoon unit, and Uzi Shaya, as indicated by the affidavit of Shlomo Matalon; the information was already given to the court in the framework of Shlomo Matalon's affidavit; the information is not confidential (as evidenced by the fact that it was given both to Darshan-Leitner and via her to the plaintiffs, and by the fact that it was given to the court); the information is available in the public realm and anyone interested can examine it; the fact that only now is Uzi Shaya required to come to the witnesses stand is incidental and insignificant. This fact is exclusively the product of protracted legal proceedings. Were it not for the protracted legal proceedings, Shaya would have taken the witness stand a long time ago; the aforementioned undertakings pertain to a specific, limited matter (i.e. assistance in evidence in specific claims) and with respect to specific, identified bodies, and the undertaking is not related to general or long term policy.

60.    In view of the aforementioned, even according to the most restrictive interpretation of the conditions for the enforcement of a governmental promise, the aforementioned promise constitutes a binding and enforceable governmental promise, which means that is it possible to compel the State of Israel to enable the testimony of Uzi Shaya against BOC

### D.3    The State's Undertaking By Way Of Harpoon Is Subject To Estoppel Against An Authority.

61.    Based on the relevant factual information set forth above, it emerges that the State of Israel, by way of the Harpoon Unit, made a representation and gave a promise to Darshan-Leitner and the plaintiffs, to the effect that if they filed the claims against BOC for having served as a means for financing terror, and for the damages caused to them as a result, they would receive active assistance on the part of the State of Israel, in the form of providing them with the evidence necessary for the conduct of proceedings, and specifically by enabling the testimony of Uzi Shaya (subject to the conditions agreed upon with him, with the knowledge and authorization of the State of Israel).

62.    Furthermore, based on the relevant factual background it emerges that the State of Israel by way of the Harpoon unit, made a representation whereby the State of Israel initiated the suits against BOC, encouraged them, supported and would continue to support them for the entire duration until their termination.

63.    The representation and promise were made both orally and in writing, explicitly and by implication (in the form of actual conduct) and they did so consistently until the moment at which the State suddenly reneged on them,

64.     The factual representation whereby the State had the ability to assist Darshan-Letiner and the plaintiffs is a correct one, as detailed at length above; accordingly, even had the presentation not been correct, it would not derogate from the claim of estoppel, as mentioned.

65.     The promise given to Darshan-Leitner and the plaintiffs is of legal force in and of itself, both as a governmental promise as stated, and as a governmental contract as detailed above, and as elaborated upon below. Nonetheless, even had it had no legal standing, this would not derogate from the estoppel claim, as explained above.

66.     Darshan-Leitner and the plaintiffs actually relied on the aforementioned representation and promise, as specified above.

67.     The aforementioned reliance on the representation and promise was ultimately reasonable. Any reasonable person, in those circumstances, would have relied on explicit, clear and detailed representation and promise given as part of an initiative of the body charged with the battle against terror in Israel, and subordinate to the Prime Minister's Office, which is the competent body for handling this matter (and not by chance, is also the body with the information that Uzi Shaya's testimony is expected to relate to, and which was also included in the affidavit of Shlomo Matalon). *A fortiori*, the reliance of Darshan-Leitner and the plaintiffs was absolutely reasonable based on the longtime familiarity with and continuing cooperation continuing cooperation between Darshan-Leitner and the Harpoon unit, and against the background of the fact that the initiative for filing suits against BOC was that of the Harpoon unit itself, and based on the protracted discussions that preceded the broad undertaking and the specific undertaking concerning the testimony of Uzi Shaya.

68.     The reliance on the aforementioned representation and promise was in good faith, both *de jure* and for the duration, both for the reasons set forth in the preceding section and in

view of the fact that Darshan-Leitner and the plaintiffs were cooperated with by the Harpoon personnel for their claims, until all of a sudden the State of Israel chose to renege on its undertakings.

69.     In this case it is clear beyond all doubt that the representation was made and the promise was given by those who are authorized to deal with the matter and to give an undertaking in that regarding on behalf of the State of Israel. It is likewise clear that not only were the representation and the promise not contrary to any law, but that they are actually consistent with the policy of the State of Israel, as a state confronting terrorist threats on a scale unparalleled anywhere in the world, a policy consisting of a battle to the end against terror and its infrastructures and a series of Israeli laws including provisions intended to battle against terror and its infrastructures in general and specifically the funding of terror, including: Prohibition on Financing Terrorism Law, 5765-2005, Prohibition on Money Laundering Law, 5700-2000, Battle Against Organized Crime Law 5763 – 2003;Prevention of Terrorism Ordinance, 5708-1948; and the Penal Law, 5737-1977.

70.     As a result of the reliance on the aforementioned representation and promise Darshan – Leitner and the plaintiffs detrimentally changed their position in a particularly significant manner: Based on the representations and the promises the legal suits were filed, tremendous efforts and funds having been invested in their preparation, and a number of legal proceedings were conducted relating to these suits, which likewise demanded tremendous effort and huge amounts of money. All of these came instead of other claims and other actions in which the very same resources could have been invested and which meanwhile would have yielded proceeds. The representation and the promise to supply good and reliable evidence that would enable a decision on the suits in the plaintiffs' favor, created expectations for success both on the

part of Darshan-Leitner and on the part of the plaintiffs. The success in defeating the application for a dismissal with the help of Shelomo Matalon's affidavit only served to increase the expectation of continued cooperation with the Harpoon unit, and for success in the claims, in view of the fruits of the cooperation with the Harpoon unit thus far, and actually made these expectations even more concrete and crystallized. The claims merited extensive media coverage and became identified with Darshan-Leitner so much so that the withdrawal of the claims by the plaintiffs, or a loss therein, may be expected to cause immense harm to the reputation of Darshan-Leitner and to place them in a most embarrassing light. The plaintiffs can expect to be gravely disappointed, in the knowledge that the State of Israel reneged on the representation and promise given to them, and prevented them from receiving the evidence that would have enabled them to win their suit.

71.     The damage expected to be caused to Darshan –Leitner and the plaintiffs as a result of their detrimental reliance on the representation and the promise is therefore particularly far-reaching.

72.     Moreover, State of Israel's sudden repudiation of its undertakings, after it had repeatedly honored them over a period of time, and after it had given its approval for Uzi Shaya to testify, attests to the State's lack of good faith in this matter, and *a fortiori* to its non-compliance with the intensified duty of good faith by which a governmental authority is bound. The fact that the State is relying on a security-based claim, notwithstanding that the contents of Shaya's testimony are already known to all (after the details were given to the court), only serves to strengthen the conclusion that the State exploited Darshan-Leitner and the plaintiffs for its own needs, but suddenly abandoned them when it decided to do so for reasons that are not

known, but which are definitely not related to State security and which cannot be related to State security.

73.    In view of the above, the doctrine of estoppel against the authority applies to the representation and the promise; the State of Israel is prevented from challenging the veracity of representation and/or the validity of the promise, and they are enforceable. This means that it is possible to compel the State of Israel to enable the testimony of Uzi Shaya in the suits against BOC given the applicability of estoppel against an authority (even if the claim of governmental promise against the authority and/or the existence of a governmental contract is not recognized in this case).

### D.4    The State's Undertaking via Harpoon Constitutes a Binding Governmental Contract

74.    The Harpoon unit initiated a request to Darshan-Leitner (and through her agency to the potential plaintiffs) concerning the filing of suits against BOC.

75.    In the wake of this initiative, Darshan-Leitner and through her the plaintiffs, made an offer to the Harpoon unit as mentioned above, and its essential terms were that lawsuits would be filed against the BOC on behalf of terror victims and their families, on the basis of the information provided by the Harpoon personnel, to recover for the damages they suffered as a result of the terror attacks – and this on the condition that the State of Israel will make available to Darshan-Leitner and the plaintiffs the requisite evidence to successfully litigate the lawsuits.

76.    The offer attested to the resolve of Darshan –Leitner and the plaintiffs who would be joined to the claim to enter into a contract with the State of Israel in the framework of which they would file the suits and conduct them (which is an outstanding interest of the State of Israel, on whose behalf the request was initially made by the Harpoon unit) and the State of Israel would place the evidence at their disposal. The offer was absolutely clear and detailed to a

degree that upon being accepted by the State of Israel, a contract would be concluded between the parties.

77.     Acceptance of the offer attests to the resolve of the State of Israel to enter into a contract under those conditions, and upon acceptance of the offer a contract was concluded.

78.     The conduct of the parties likewise attests that the parties saw themselves as being contractually bound and behaved accordingly until the State of Israel suddenly chose to unilaterally repudiate its undertakings, in other words, chose to breach the contact.

79.     The plaintiffs are a party to a contract that was concluded by their attorneys, and as a party to a contract they are entitled to demand enforcement of the contract; alternatively, the plaintiffs are a third party in whose favor the contract was also concluded. Since the plaintiffs received notice of the existence of the contract no later than the date on which they joined the suit (in other words, years before the State of Israel repudiated its undertakings and breached the contract) and in view of their personal interest in the performance of the contract, (compensation as a result of the suits which will come to the plaintiffs, after writing off certain sums that they will have to pay), they are entitled to demand that the State of Israel fulfill its undertakings according to the contract, in addition to the right of Darshan-Leitner to do so.

80.     None of the grounds of voidness or voidability recognized in contracts law are applicable to the contract, and the State of Israel made no claim to that effect,

81.     The breach of the contract by the State of Israel entitles Darshan Leitner and the plaintiffs to the remedy of enforcement, namely receiving a decision that compels the State of Israel to enable the testimony of Uzi Shaya. In this case there is no applicability to any of the exceptions to the enforcement of the contract pursuant to the Contracts (Remedies for Breach of Contract) Law, 5731-1971, and the State of Israel made no claim to that effect.

82.     The contract is not subject to the obligation of a tender, given that it is not a contract for the execution of a transaction in goods or land, or for the execution of work, or the purchase of services, and the State of Israel made no claim to that effect.

83.     There is no compelling public justification, or indeed any kind of public justification, that enables the State of Israel to be released from the contract in accordance with the "release rule" The information included in the testimony of Uzi Shaya is not confidential, and as stated, has already been made public and is accessible to all. Moreover, the security excuse used by the State of Israel of Israel in its post-facto justification of its decision to breach the contract attests to lack of good faith in performance of an obligation arising from a contract (the obligation to provide the evidence that the State undertook to provide, and specifically, to enable the testimony of Uzi Shaya), given that the State received its request (the filing of suits against BOC) and thereafter suddenly changed its position and chose to repudiate its undertakings. Accordingly and in the view of the intensified duty of good faith binding a governmental authority, enabling the State of Israel to be released from the contract in accordance with the "release rule" would mean granting a prize for fundamentally unconscionable conduct, and in my view the chances of such a contention being accepted by an Israeli court are extremely low.

84.     In view of all the above, the aforementioned undertakings constitute a binding and enforceable governmental contract, which means that the State of Israel can be forced to enable the testimony of Uzi Shaya against BOC, given the existence of a valid governmental contract (even if in this case the claim of a governmental promise, and/or the claim of estoppel against an authority are not accepted.

I DECLARE UNDER THE PENALTIES FOR PERJURY OF THE UNITED STATES OF

AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.


EXECUTED THIS 17th day of December, 2013, Tel Aviv, Israel.

_____
Roy Cohavi